UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA     :
             :
             :
    v.          :   No. 10 Cr. 1217-03 (KMW)
             :
             :
MICHAEL WELTY,       :
             :
     Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

MEMORANDUM IN SUPPORT OF DEFENDANT
MICHAEL WELTY'S MOTION FOR A NEW TRIAL

Gregory L. Poe (admitted *pro hac vice*)
Preston Burton (admitted *pro hac vice*)
Rachel S. Li Wai Suen (RS-1145)
Poe & Burton PLLC
The Executive Building
1030 15th Street, N.W., Suite 580 West
Washington, D.C.  20005
(202) 583-2500

*Attorneys for Defendant Michael Welty*

TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................ 3

I.      Summary Of Evidence At Trial ....................................................................... 3

II.     The Government's October 16, 2013 Disclosure Of Evidence ....................... 7

III.    The Goldberg Email And The IHFA Transaction ......................................... 10

ARGUMENT .................................................................................................................. 11

I.      The Court Should Grant A New Trial For Mr. Welty
        On Counts 1, 2, And 4 Due To A *Brady* Violation ...................................... 11

        A.      Legal Standards ................................................................................... 11

        B.      The Goldberg Email Was Suppressed ................................................ 14

        C.      The Goldberg Email Is Material As To All Counts of Conviction ....... 14

        D.      A New Trial Also Should Be Granted For Mr. Welty In Light
                Of The Arguments That He Will Make In His Pending Appeal .......... 19

II.     The Court Should Grant A New Trial For Mr. Welty On
        Counts 1, 2, And 4 Under Rule 33(b)(1) Regardless Of *Brady* ................... 19

III.    Mr. Welty Requests An Evidentiary Hearing
        And Oral Argument On This Motion ............................................................. 21

CONCLUSION ............................................................................................................... 22

CERTIFICATE OF SERVICE

TABLE OF AUTHORITIES

Federal Cases                                                                                              Page

*Brady* v. *Maryland*, 373 U.S. 83 (1963) ...........................................................1, 12, 14

*Giglio* v. *United States*, 405 U.S. 150 (1972) .........................................................12

*Kyles* v. *Whitley*, 514 U.S. 419 (1995) ...........................................................12, 13, 14

*Orena* v. *United States*, 956 F. Supp. 1071 (E.D.N.Y. 1997) .......................................13

*Strickler* v. *Greene*, 527 U.S. 263 (1999) .............................................................12, 14

*United States* v. *Agurs*, 427 U.S. 97 (1976) ...............................................1, 12, 13, 14

*United States* v. *Alessi*, 638 F.2d 466 (2d Cir. 1980) ............................................ 20-21

*United States* v. *Bagley*, 473 U.S. 667 (1985) ........................................................13

*United States* v. *Camacho*, 302 F.3d 35 (2d Cir. 2002).................................................3

*United States* v. *Camacho*, 163 F. Supp. 2d 287 (S.D.N.Y. 2001)..............................21

*United States* v. *Canova*, 412 F.3d 331 (2d Cir. 2005) ...........................................20

*United States* v. *Coppa,* 267 F.3d 132 (2d Cir. 2001) ..........................................12, 14

*United States* v. *DiPaolo*, 835 F.2d 46 (2d Cir. 1987) ...........................................21

*United States* v. *(Carlos) Garcia*, 291 F.3d 127 (2d Cir. 2002) ..............................16

*United States* v. *(Yuri) Garcia*, 413 F.3d 201 (2d Cir. 2005) ..................................17

*United States* v. *Gil*, 297 F.3d 93 (2d Cir. 2002) ................................................. 14-15

*United States* v. *Grinage*, 390 F.3d 746 (2d Cir. 2004) ...........................................17

*United States* v. *Kelly*, 790 F.2d 130 (D.C. Cir. 1986) .............................................1

*United States* v. *Mahaffy*, 693 F.3d 113 (2d Cir. 2012) ................................. 11, 12, 13, 14, 20-21

*United States* v. *Maniktala,* 934 F.2d 25 (2d Cir. 1991) ...........................................12

*United States* v. *Owen,* 500 F.3d 83 (2d Cir. 2007) ...............................................20, 21

TABLE OF AUTHORITIES (continued)

Federal Cases (continued)                                                                Page

*United States v. Payne,* 63 F.3d 1200 (2d Cir. 1995) ...................................................12

*United States* v. *Persico*, 645 F.3d 85 (2d Cir. 2011) .....................................................1

*United States* v. *Petrillo*, 237 F.3d 119 (2d Cir. 2000) ................................................21

*United States* v. *Quinn*, 475 F.3d 1289 (D.C. Cir. 2007) ..............................................3

*United States* v. *Sanchez*, 969 F.2d 1409 (2d Cir. 1992) .............................................1

*United States* v. *Schwarz*, 259 F.3d 59 (2d Cir. 2001) ...............................................14

*United States* v. *Seijo*, 514 F.2d 1357 (2d Cir. 1975) .................................................13

*United States v. Stewart,* 433 F.3d 273 (2d Cir. 2006) ................................................12

*United States* v. *Stofsky*, 527 F.2d 237 (2d Cir. 1975) ...........................................12, 13

*United States* v. *Triumph Capital Grp.*, 544 F.3d 149 (2d Cir. 2008) .........................................14

*United States* v. *Tutino*, 883 F.2d 1125 (2d Cir. 1989) ...........................................20, 21

*United States* v. *Wallach*, 935 F.2d 445 (2d Cir. 1991) ..............................................12


Statutes and Rules

Fed. R. App. P. 12.1...................................................................................3

Fed. R. Crim. P. 33  ..................................................................................1

MEMORANDUM IN SUPPORT OF DEFENDANT
MICHAEL WELTY'S MOTION FOR A NEW TRIAL

Pursuant to Fed. R. Crim. P. 33, *Brady* v. *Maryland*, 373 U.S. 83 (1963), and the Due

Process Clause of the Fifth Amendment to the U.S. Constitution, defendant Michael Welty,

through counsel, respectfully submits this memorandum in support of his motion for a new trial.

Mr. Welty respectfully requests an evidentiary hearing and oral argument on his motion.

INTRODUCTION

Mr. Welty is entitled to a new trial because the government failed to disclose, before or

during his August 2012 trial, evidence that goes to the heart of his defense.  The Court "may

vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P.

33(a), 33(b)(1); see *United States* v. *Persico*, 645 F.3d 85, 109 (2d Cir. 2011).  Rule 33 gives a

court "broad discretion . . . to set aside a jury verdict[.]"  *United States* v. *Sanchez*, 969 F.2d

1409, 1413 (2d Cir. 1992).  The standard for evaluating a motion for a new trial depends on

whether the defendant asserts that newly discovered evidence was found in a "neutral source" or

asserts that the government failed to disclose *Brady* material in its possession.  *United States* v.

*Agurs*, 427 U.S. 97, 110 (1976).  The defendant bears a heavier burden in the neutral source

scenario.  When *Brady* applies, "the usual standards for a new trial are not controlling because

'the fact that such evidence was available to the prosecutor and not submitted to the defense

places it in a different category than if it had simply been discovered from a neutral source after

trial.'"  *United States* v. *Kelly*, 790 F.2d 130, 135 (D.C. Cir. 1986) (quoting *Agurs*, 427 U.S. at

111).

As we show below, a new trial is warranted under *Brady*, so the Court does not need to

make a determination under the neutral source standards (although a new trial is appropriate

under that rubric as well).  The undisclosed evidence – specifically, an email from Douglas

1

Goldberg at CDR to Jeffrey Ziglar at UBS that includes Matthew Rothman at CDR and Mr. Welty as recipients, see Attachment 1 ("Ziglar Decl."), Ex. E ("Goldberg Email") – taints all three conspiracy counts on which Mr. Welty was convicted.  The Goldberg Email, which the government has possessed since November 2006 but produced only in October 2013, relates to a disputed transaction involving Messrs. Goldberg and Rothman (government cooperating witnesses who testified at trial), on the one hand, and Messrs. Welty and Ziglar (a UBS employee who worked with Mr. Welty and testified at trial on Mr. Welty's behalf), on the other.  Messrs. Goldberg and Rothman asserted that UBS had bid on and won the transaction; Messrs. Welty and Ziglar asserted that UBS had provided only an "indication" to CDR and not a bid.  As the Goldberg Email shows, Mr. Goldberg was prepared to concede the dispute over whether UBS submitted a bid if Mr. Welty could produce an audio recording with the word "indication" on it.

The undisclosed evidence lies at the intersection of crucial trial issues.  First, it is inconsistent with opinion testimony by Mark Zaino, a former CDR employee who joined UBS in March 2001 (Tr. 498-99), which gave Mr. Zaino an aura of expertise.  Mr. Zaino was by far the government's most important witness against Mr. Welty on every count of conviction.  Mr. Zaino testified that Mr. Welty and Peter Grimm at GE meant "bid" when they used the word "indication" on audio recordings of Count 4 transactions and that Mr. Welty's conduct caused harm to his client.[1]  Tr. 1118-19, 1231. Those audio recordings were by far the government's most important non-testimonial evidence against Mr. Welty.  Second, the Goldberg Email is inconsistent with the government's summation as to Mr. Welty.  Based on Mr. Zaino's opinion

---

[1]  We argue in Mr. Welty's pending motion for release pending appeal that Mr. Zaino's opinion testimony is inconsistent with Fed. R. Evid. 701 (and 602).  Dkt. 405 at 25-30.  That issue will be raised in Mr. Welty's pending appeal.

testimony, the government argued – to support its assertion that Mr. Welty had the intent to harm (an essential element of every charged offense) – that Mr. Welty engaged in a pattern of misconduct by lowering Mr. Grimm's "original bids." Tr. 4285, 4299, 4346-52.

Mr. Zaino's opinion testimony and the government's summation based on that testimony constituted the government's best vehicle at trial for convincing the jury that Mr. Welty intended to inflict harm. The Goldberg Email, as we show below, would have punctured that evidence and argument. Because Mr. Welty was unfairly deprived of the ability to use the Goldberg Email at trial, and because the undisclosed evidence should undermine confidence in the verdicts against Mr. Welty, we respectfully request that the Court grant a new trial for Mr. Welty on Counts 1, 2, and 4.[2]

<u>FACTUAL BACKGROUND</u>

I.      <u>Summary Of Evidence At Trial.</u>

Mr. Welty was charged in a superseding indictment returned on September 15, 2011 (Dkt. 30), with three counts of conspiracy to commit wire fraud (Counts 1, 2, and 4) and one count of substantive wire fraud (Count 3). Mr. Welty's co-defendants, Peter Ghavami and Gary Heinz, were also charged in Counts 1, 2, and 3. Mr. Heinz was charged in Count 4 along with Mr. Welty. Mr. Heinz was also charged in Counts 5 and 6. After a month-long trial, Mr. Welty was convicted on each of the three conspiracy charges against him (Counts 1, 2, and 4). He was acquitted on the substantive wire fraud charge against him (Count 3). Tr. 4864-65.

---

[2]  For the reasons explained in our December 18, 2013 letter to the Court (Dkt. 451), we believe that Mr. Welty's interests and the interests of judicial economy are best served by early consideration of this new trial motion in light of the April 1, 2014 deadline for the filing of opening briefs in Mr. Welty's pending appeal from his convictions on Counts 1, 2, and 4. The Court has jurisdiction to consider Mr. Welty's motion for a new trial. If the Court determines that it will "grant the motion or that the motion raises a substantial issue[,]" the rules prescribe particular procedures to be followed. See Fed. R. App. P. 12.1; *United States* v. *Camacho*, 302 F.3d 35, 37 (2d Cir. 2002); *United States* v. *Quinn*, 475 F.3d 1289, 1290-91 (D.C. Cir. 2007).

Count 1 charged Mr. Welty and his co-defendants with acting on behalf of UBS in a provider capacity in a conspiracy that included employees of J.P Morgan and Bank of America. Former J.P. Morgan employees Alex Wright and James Hertz testified as cooperating government witnesses against Mr. Welty's codefendants. Neither Mr. Wright nor Mr. Hertz had anything incriminating to say about Mr. Welty. Tr. 1897, 3580. The evidence at trial showed that Mr. Welty had no relationship with J.P. Morgan or its employees regarding the conduct alleged in Count 1.

The only witnesses against Mr. Welty with respect to Count 1 were Mr. Zaino and former Bank of America employee Douglas Campbell. The evidence showed that Mr. Welty did not have a relationship with either Mr. Zaino or Mr. Campbell before Mr. Zaino joined UBS in March 2001.[3] Tr. 506-07, 2355. The Count 1 transactions in which Mr. Welty was involved as a provider were the Municipality of Anchorage and Rhode Island Tobacco escrow transactions on June 18 and 19, 2002. Several audiotapes were introduced into evidence concerning those transactions. The evidence did not show, and the government did not argue, that the brokers on those transactions were involved in any wrongdoing. Nor did the evidence show that Mr. Welty knew the identities or number of potential providers bidding on the deals or what their bids were. As discussed in our memoranda in support of Mr. Welty's motion for release pending appeal, the evidence at trial was consistent with Mr. Welty's theory of defense with respect to the Anchorage transaction. Dkt. 405 at 23-24; Dkt. 418 at 18. As also discussed in those memoranda, the evidence viewed in *any* light did not show that Mr. Welty committed wrongdoing with respect to the Rhode Island Tobacco transaction. Dkt. 405 at 23; Dkt. 418 at 18-19.

---

[3] Mr. Zaino and Mr. Campbell were also the primary government witnesses concerning Count 3 of the superseding indictment on which Mr. Welty was acquitted.

Count 2 charged Mr. Welty and his co-defendants with acting on behalf of UBS in a provider capacity in a conspiracy that included CDR, the most prominent broker in the municipal bond industry, and CDR employees. No audiotapes implicating Mr. Welty were introduced into evidence on Count 2. Although CDR's owner and principal, David Rubin, testified at trial concerning his relationships with Mr. Welty's co-defendants and Mr. Zaino, Tr. 3191-92, Mr. Rubin had nothing incriminating to say concerning Mr. Welty. Tr. 3192-93. The government's witnesses against Mr. Welty on Count 2 were Mr. Zaino and former CDR employees Douglas Goldberg and Matthew Rothman. Mr. Zaino's testimony concerning Mr. Welty with respect to certain Count 2 escrow transactions was provided at a high level of generality. Tr. 869-71, 884-85, 894-96, 911. Mr. Zaino provided testimony that actually supported *Mr. Welty's* position on the key Georgia Baptist transaction in Count 2. Dkt. 405 at 20-21 (citing Tr. 929-30).

The testimony of Messrs. Goldberg and Rothman concerning Mr. Welty was consistent with Mr. Welty's theory of defense on Count 2. Dkt. 405 at 19-22, 37; Dkt. 418 at 17-18. In addition, the evidence at trial provided reason for the jury to question the testimony of the cooperating witnesses from CDR as to Mr. Welty. For example, the jury learned that Mr. Rothman mentioned only Mr. Zaino at UBS, not Mr. Welty, when Mr. Rothman testified at the *Carollo* trial concerning identities of persons with whom he had committed misconduct. DX-W-3503-052; Tr. 3515-18, 4031. The evidence showed that Mr. Welty did not like CDR and had no relationship with CDR or any of its employees before Mr. Zaino joined UBS-PaineWebber in March 2001. Tr. 1592-93; Dkt. 408 at 28-29. The evidence further showed that Messrs. Welty and Ziglar, in November 2004, were involved in a contentious dispute with Messrs. Rothman and Goldberg concerning a New Mexico Finance Authority transaction. Tr. 3902-04.

Count 4 charged Mr. Welty with acting on behalf of UBS as a bidding agent for municipal issuers in an unlawful conspiracy with Mr. Grimm at GE, a provider of guaranteed investment contracts (GICs), to award GICs to GE at suppressed interest rates.   The government's evidence against Mr. Welty concerning Count 4 consisted almost entirely of audiotape recordings between Messrs. Welty and Grimm and Mr. Zaino's commentary concerning those audiotape recordings.   Mr. Zaino did not participate in the recorded conversations or the key transactions themselves.  The government's primary theory with respect to the audiotape recordings was that Mr. Grimm provided bids that Mr. Welty subsequently lowered to the detriment of UBS's issuer clients.  As discussed above, the key evidentiary underpinning for that theory, which was a focal point of the government's summation concerning Mr. Welty, was Mr. Zaino's testimony that Messrs. Welty and Grimm meant "bid" when the word "indication" was used on the recordings and that Mr. Welty lowered Mr. Grimm's "bids" to ensure that Mr. Grimm won the transactions.

Overall, the evidence at trial showed Mr. Welty's limited role in the UBS hierarchy and was consistent with his theory of defense.  The evidence showed that Mr. Welty had worked at UBS and its predecessor, PaineWebber, since 1987 without incident until the time period charged in the indictment beginning in 2001.  The evidence at trial also showed that Mr. Welty had been targeted for termination after Messrs. Heinz and Zaino joined UBS in 2001.  Tr. 1576-77.  Furthermore, as cross-examination of Mr. Zaino showed, a substantial basis existed for the jury to conclude that Messrs. Welty and Zaino had a hostile relationship.  See, *e.g.*, Tr. 1570 (Mr. Zaino repeatedly left drawings of tortured and decapitated cats at Mr. Welty's workstation knowing that Mr. Welty loved his cat).  On direct examination alone, Mr. Zaino contradicted himself concerning whether the Commonwealth of Puerto Rico transaction (at issue in Counts 2

and 4) was illegal.  Tr. 1038; Tr. 1047-49; Tr. 1812-13.  See also Tr. 4032, Exhibit S-4 (stipulation that FBI agent would have testified that Mr. Zaino could not recall in a 2006 interview whether the transaction was illegal).  A reasonable jury could have chosen to discount Mr. Zaino's testimony concerning Mr. Welty's knowledge of and role in wrongdoing.

II.      The Government's October 16, 2013 Disclosure Of Evidence.

In September 2013, counsel for defendants learned from a third party that the government was planning to produce hundreds of thousands of electronic CDR records in *United States* v. *Murphy*, No. 3:12-CR-00235-MOC-DCK (W.D.N.C.).  Dkt. 439-1.  Counsel for Mr. Welty immediately raised the issue with the government.  *Id.* (September 9 letter to government). Counsel for defendants and the government engaged in two conference calls on September 17 and September 26 concerning the issue.  Dkt. 439-2 at 1; Dkt. 439-4 at 1-2.  Since the September 26 call, the parties have engaged in extensive correspondence concerning the discovery issues.[4] On October 16, 2013, the government produced approximately 317,000 documents that include the Goldberg Email.  Dkt. 439-3.  Since then, the government has made three supplemental

---

[4]  See Dkts. 439-2 (September 30 letter from government to defense counsel); 421 (October 11 letter to Court from counsel for Mr. Heinz); Dkt. 439-3 (October 15 letter from government to defense counsel); 439-4 (October 16 letter to government from counsel for Mr. Welty); Dkt. 423 (October 18 letter to Court from counsel for Mr. Heinz bearing endorsement); 439-5 (October 21 letter from government to defense counsel); 439 (November 8 letter from counsel for Mr. Welty to Court); 442 (November 8 letter from counsel for Mr. Heinz to Court bearing endorsement); 440 (November 8 letter to Court from counsel for Mr. Ghavami); 448 (November 21 letter to Court from government); 447 (November 22 letter to Court from counsel for Mr. Welty bearing endorsement); 446 (November 22 letter to Court from counsel for Mr. Heinz bearing endorsement); 445 (November 22 letter from government to defense counsel); 450 (November 24 letter to Court from counsel for Mr. Heinz bearing endorsement); 451-1 (November 26 letter to government from counsel for Mr. Welty); 451-2 (December 13 letter from government to defense counsel); 451-3 (December 16 letter from government to defense counsel); 451 (December 18 letter to Court from counsel for Mr. Welty); Attachment 2 (December 20 letter from government to defense counsel); and Dkt. 455 (December 24 letter to Court from government).

productions containing more than 70,000 documents.   See Dkt. 445, Exhibit A; Dkt. 451-2;

Attachment 2 (December 20 letter from government to defense counsel).

The government's December 24 letter to the Court (Dkt. 455) contains new information.

We now know for the first time that the government learned in February 2012 from Evan

Zarefsky (a former CDR employee and a cooperating witness who pleaded guilty in January

2012 and testified at the *Carollo* trial) and his counsel that emails in a "Goldmine" database

system used by CDR "had not been included in the Government's 'deal buckets' production in

the *CDR* case."   Dkt. 455 at 4.   Apparently, although the government does not provide details,

the issue at that point was left alone based on a general response from the government's

"technical staff" to a query from the government's "legal staff."   *Id.*   As we understand the

government's December 24 letter, no audit or document-based testing of Mr. Zarefsky's

concerns occurred at that point.

The government also states that in 2013, after the *Carollo* trial and Mr. Welty's trial had

concluded, and many months before the Court sentenced Mr. Welty and his codefendants, Mr.

Zarefsky again raised an issue in the course of his ongoing cooperation concerning the absence

of CDR records.   *Id.*   Mr. Zarefsky provided to the government some email examples from

CDR's system.   *Id.*   The government was unable to locate those emails through a manual review

on the government's system.   *Id.*   For reasons unknown to us, the government did not notify

counsel for defendants of potential nondisclosure problems. The government "enlisted CDR's

assistance in converting, processing, and reviewing for privilege the Goldmine email system as it

existed in December 2006."   *Id.*   At that point, CDR and its former employees had been

cooperating with the government for more than a year, having pleaded guilty in January 2012,

and at least CDR, Mr. Rubin, and Mr. Goldberg (and perhaps Messrs. Wolmark, Zarefsky, and

Rothman) were pending sentencing.  As stated above, counsel for defendants first learned about the issue of the undisclosed CDR records from a third party in September 2013 on the verge of the government's production in the *Murphy* case.  Dkt. 439-1.

We have now learned for the first time that the government concedes that it "did not produce before trial the entirety of the Goldmine files that it had seized."  Dkt. 455 at 2.  Before October 16, the government had "informed us at several points that we had received data in the same format in which the government received it."  Dkt. 439-4 at 2; see also Dkt. 423 at 2.  We have also learned for the first time that the "seized Goldmine system had not been loaded into [the government's] review database platform due to inadvertence[.]"  Dkt. 455 at 2.  The government's explanation of how that failure occurred is unclear.

Although the government has not fully explained the circumstances of its failure to produce CDR records to defendants before trial, the government has not contested that the Goldberg Email (Attachment 1, Exhibit E) has been in its possession since November 15, 2006, when the government executed a search warrant at CDR's premises.  Dkt. 455 at 1.  Nor has the government suggested that the Goldberg Email was produced to counsel for defendants in *any* format from *any* custodian before October 16, 2013.  We take the government's ongoing silence concerning the disclosure status of the Goldberg Email – a document that we specifically identified and addressed at length in our November 8 letter to the Court (Dkt. 439) – as a concession that we did not receive it before October 16, 2013.  The government itself produced a spreadsheet to us as an enclosure to an October 21 letter showing that the Goldberg Email has no counterpart in the UBS pretrial document production.  See Attachment 3; Dkt. 439-5; see also Dkt. 423 at 5.

III.     The Goldberg Email And The IHFA Transaction.

The Goldberg Email relates to an escrow transaction that CDR brokered for the Idaho Health Facilities Authority (IHFA) on March 16, 2005.  Ziglar Decl., Ex. A.  Mr. Rothman at CDR sent the bid specifications to persons at five companies, including Mr. Welty at UBS.  *Id.*, Ex. B.  At 2:35 p.m., Mr. Welty sent an email to Mr. Rothman stating that UBS was "out" and that its "indication" was "not an offer."  *Id.*, Ex. C.[5]  At 3:05 p.m., Mr. Ziglar sent an email to Messrs. Rothman and Goldberg, copying Mr. Welty, stating: "For the record no trade has been done with UBS on this deal."  *Id.*, Ex. D.  Four minutes later, Mr. Goldberg replied all, and stated, "***For the record until I hear a tape using the words indication we are not through with this conversation!***"  *Id.*, Ex. E (emphasis added).

At 4:00 p.m., Mr. Goldberg wrote to Messrs. Ziglar and Welty (and Mr. Rothman), stating that David Rubin would be calling Terry Atkinson to discuss the dispute.  *Id.*, Ex. F.  At the time, Terry Atkinson was the head of the municipal securities group at UBS.  Tr. 3851.  Mr. Welty sent an email to Mr. Goldberg at 4:53 p.m. stating: "I am expecting a[n] email from our infrastructure manager that confirms we have no taping on our desks.  I will forward on to you with details asap."  *Id.*, Ex. G.  Mr. Goldberg forwarded that email to Mr. Rothman at 4:56 p.m. *Id.*, Ex. H.  The next morning, Mr. Welty sent an email to Mr. Rothman confirming that UBS "does not record telephone calls except under special circumstances and so we cannot provide you any verbatim record of the discussion."  *Id.*, Ex. L.  Mr. Rothman forwarded that email to Mr. Goldberg three minutes later.  *Id.*

---

[5]  The bid specifications for the IHFA transaction state that the bid deadline was 2:00 p.m. Eastern Standard Time on March 16, 2005.  Ziglar Decl., Ex. A., Section IX.  The time stamps on many of the IHFA emails appear to denote Pacific Standard Time.  We have adjusted the times shown on many of the emails by three hours for purposes of the discussion in this memorandum.

Before trial, counsel for Mr. Welty asked Mr. Ziglar whether he recalled any matters in which the dealings of Messrs. Welty and Ziglar with CDR became hostile or contentious.  Ziglar Decl., ¶ 2.  Mr. Ziglar recalled one such transaction, involving the New Mexico Finance Authority, and testified at trial concerning that deal.  Tr. 3902-04.  He did not recall any other such transactions.  Ziglar Decl., ¶ 2.  After October 16, 2013, as a result of having been shown the Goldberg Email and other documents concerning the IHFA transaction (attached to the Ziglar Declaration as Exhibits A-L), Mr. Ziglar recalled the IHFA dispute.  Ziglar Decl., ¶ 3.  As Mr. Ziglar states:

> I recall that personnel at CDR acted in a broker capacity on behalf of the IHFA and that Mr. Welty on behalf of UBS received an invitation to bid on the transaction.  I recall that I worked with Mr. Welty on the matter and that I provided an oral indication to Mr. Rothman concerning the potential transaction but that I did not provide a bid.  I recall that Messrs. Rothman and Goldberg took the position that UBS had made a bid and that they attempted to award the transaction to UBS based on the indication that had been given.  UBS denied having made a bid, and a dispute arose as to whether the information that I provided was presented as an indication or as a bid.  I recall that the dispute was resolved consistent with our position on behalf of UBS and that UBS did not participate in the IHFA escrow transaction.

*Id.*  According to the UBS database of transactions that the government introduced into evidence at trial, see GX-50-21, the IHFA transaction was not consummated with UBS, consistent with Mr. Ziglar's recollection.

ARGUMENT

I.   **The Court Should Grant A New Trial For Mr. Welty**
     **On Counts 1, 2, And 4 Due To A *Brady* Violation.**

   A.   Legal Standards.

Under *Brady*, the government is required to "disclose material evidence favorable to a criminal defendant."  *United States* v. *Mahaffy*, 693 F.3d 113, 127 (2d Cir. 2012) (vacating convictions in securities fraud case due to *Brady* violation).  The Second Circuit has "long

11

recognized that *Brady* violations obscure a trial's truth-seeking function and, in so doing, place criminal defendants at an unfair disadvantage." *Id.* at 134; accord *United States v. Maniktala,* 934 F.2d 25, 28 (2d Cir. 1991) (*Brady* states a "rule of fairness and minimum prosecutorial obligation"). The animating purpose of *Brady* is to ensure fair trials. *Brady*, 373 U.S. at 87 ("Society wins not only when the guilty are convicted but when criminal trials are fair.").

To establish a *Brady* violation, a defendant must first show that the evidence at issue was "suppressed" (*i.e.*, not disclosed) by the government. *Strickler* v. *Greene*, 527 U.S. 263, 281-82 (1999); accord *United States* v. *Coppa*, 267 F.3d 132, 140 (2d Cir. 2001) (defendant must show that "(1) the Government, either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence resulted in prejudice."). Whether the government acted negligently or deliberately has no bearing on whether evidence was suppressed within the meaning of *Brady*. See *Giglio* v. *United States*, 405 U.S. 150, 154 (1972) ("[W]hether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor"); accord *Agurs*, 427 U.S. at 110; *Coppa*, 267 F.3d at 140. Similarly, whether the government acted in good faith or bad faith does not bear on the analysis. *Brady*, 373 U.S. at 87; accord *Kyles* v. *Whitley*, 514 U.S. 419, 432-33 (1995). A prosecutor is "presumed to have knowledge of all information gathered in connection with the government's investigation." *United States v. Payne,* 63 F.3d 1200, 1208 (2d Cir. 1995) (citing *Kyles,* 514 U.S. at 437-38).[6]

---

[6] From a remedial standpoint, the "intentional governmental suppression of evidence useful to the defense at trial will mandate a virtual automatic reversal of a criminal conviction." *United States* v. *Stofsky*, 527 F.2d 237, 243 (2d Cir. 1975) (perjury context); accord *United States* v. *Wallach*, 935 F.2d 445, 456 (2d Cir. 1991) (same); *United States v. Stewart,* 433 F.3d 273, 297 (2d Cir. 2006) (same).

The central aspect of most retrospective *Brady* analyses involves the materiality element. Undisclosed evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States* v. *Bagley*, 473 U.S. 667, 700 (1985); accord *Mahaffy*, 693 F.3d at 128. A "reasonable probability" of a different result exists when the "favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 434-35. That analysis requires a court to "evaluate the government's failure and its effect on the trial in light of the particular circumstances of the case." *Orena* v. *United States*, 956 F. Supp. 1071, 1092 (E.D.N.Y. 1997) (citing *Bagley*, 473 U.S. at 683); accord *Agurs*, 427 U.S. at 112 (court must assess likely impact of suppressed evidence "in the context of the entire record"). The evaluation "must consider directly any adverse effect" that the nondisclosure "might have had on the preparation or presentation of the defendant's case." *Bagley,* 473 U.S. at 683. See also *Stofsky*, 527 F.2d at 243 (reversal required if "'there was a significant chance that this added item . . . could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction'" (quoting *United States* v. *Seijo*, 514 F.2d 1357, 1364 (2d Cir. 1975)). The rule of *Brady* covers both substantive evidence and evidence affecting witness credibility. See *Bagley*, 473 U.S. at 677 ("When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within the general rule of *Brady*."); accord *Mahaffy*, 693 F.3d at 128.[7]

---

[7] To demonstrate materiality, a defendant is not required to show that he would have been acquitted if the evidence had been disclosed before the verdict. *United States* v. *Schwarz*, 259 F.3d 59, 64 (2d Cir. 2001). Nor must he "demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Kyles*, 514 U.S. at 434-35. Once materiality is shown under *Brady*, reversal is required, and no additional harmless-error inquiry is permitted. *Kyles*, 514 U.S. at 435-36.

B.     The Goldberg Email Was Suppressed.

The first step in the *Brady* analysis is whether the Goldberg Email was "suppressed" (*i.e.*, not disclosed) by the government.  *Strickler*, 527 U.S. at 281-82; *Coppa*, 267 F.3d at 140.  The government concedes that it failed to "produce before trial the entirety of the Goldmine files that it had seized" from CDR in November 2006 and states that its failure was "due to inadvertence." Dkt. 455 at 2.  Inadvertence and good faith do not mitigate a failure to disclose and have no bearing on the suppression analysis.  See *Brady*, 373 U.S. at 87; *Giglio*, 405 U.S. at 154; *Agurs*, 427 U.S. at 110; *Kyles* 514 U.S. at 432-33; *Coppa*, 267 F.3d at 140.  The government concedes that the Goldberg Email was not part of the UBS document production to the government that was provided to defendants.  See Attachment 3; Dkt. 439-5.  The government has known since November 8 that Mr. Welty's motion for a new trial would be based on the Goldberg Email.  It has not suggested at any time that the Goldberg Email was produced to defendants before October 16, 2013.  The Goldberg Email was thus "suppressed" within the meaning of *Brady*.

C.     The Goldberg Email Is Material As To All Counts Of Conviction.

Even if "[i]t is by no means certain that" the use of the Goldberg Email and arguments based on it "would have swayed the jury, . . . it is a real enough possibility to undermine confidence in the verdict."  *Mahaffy*, 693 F.3d at 134 (quoting *United States* v. *Triumph Capital Grp.*, 544 F.3d 149, 163 (2d Cir. 2008)).  The Court of Appeals has taken a relatively capacious approach to the "materiality" standard in the *Brady* context.  In *United States* v. *Gil*, 297 F.3d 93 (2d Cir. 2002), for example, the Court of Appeals vacated a defendant's convictions on mail fraud charges where a document had been suppressed before trial.  The defendant in *Gil* had been charged with submitting inflated subcontractor invoices on a contract with the New York City Off-Track Betting Corporation ("OTB").  *Id.* at 95.  The "defense was that the inflated

subcontractor invoices were authorized by a side agreement." *Id.* The suppressed document was an internal OTB memorandum. *Id.* at 95-96. The district court determined that the OTB memorandum was not *Brady* material because it said nothing about authorizing the defendant to file false invoices with OTB. *Id.* at 101. The Court of Appeals disagreed and stated that the OTB memorandum "had the potential to subvert th[e] background assumption" at trial that the subcontractor invoices "were being submitted to persons at OTB who (in the usual course) expected to receive accurate statements reflecting work done" under the defendant's contract with OTB. *Id.* at 102-03.

So too here: The Goldberg Email is material within the meaning of *Brady*. If not for the deprivation, Mr. Welty would have been able to use the Goldberg Email to his advantage with respect to all three conspiracy counts. The government was required to prove Mr. Welty's intent to harm beyond a reasonable doubt as an essential element of each charged offense. Tr. 4736. Although each conspiracy was charged somewhat differently and included some different participants, the charges were intertwined. For instance, the Commonwealth of Puerto Rico transaction played a prominent role in both Count 2 and Count 4, and Mr. Zaino was a conspirator in all three conspiracy counts. As the government has recognized (2/6/13 Letter to Court at 2), Mr. Zaino's testimony was "critical to every count" against Mr. Welty, and his credibility was a central part of the case against Mr. Welty.

At trial, the government's most important evidence against Mr. Welty was made up of audio recordings of conversations between Messrs. Welty and Grimm concerning Count 4 transactions and Mr. Zaino's testimony. Mr. Zaino testified that when Messrs. Welty (acting on behalf of UBS as the bidding agent) and Grimm (a potential provider) used the word "indication" on an audio recording in the Rhode Island Housing (RIH) transaction they actually meant "bid."

Tr. 1118-19.  Based on that opinion, Mr. Zaino testified that Mr. Welty lowered Mr. Grimm's "bid" and caused harm to the issuer (UBS's client).  Tr. 1126-27.  Mr. Zaino later testified, based on his review of documents and audio recordings, that the Colorado Health Initiatives deal in Count 4 was like the RIH transaction.  Tr. 1108-09.  Similarly, an audio recording of a conversation between Messrs. Grimm and Welty concerning the New Mexico Educational Assistance Foundation (NMEAF) transaction in Count 4, like the Rhode Island Housing transaction, reflects Mr. Welty asking Mr. Grimm for an indication.  GX 411634.  Mr. Zaino again opined, as he did with respect to the RIH transaction, that the word "indication" on the NMEAF audio recording meant "bid."  Tr. 1231.

Mr. Zaino's interpretation of what Messrs. Welty and Grimm meant in discussing "indications" was the government's most powerful evidence that Mr. Welty intended to inflict harm.  That opinion testimony by Mr. Zaino was at the heart of the government's case against Mr. Welty and enhanced Mr. Zaino's credibility before the jury as to Mr. Welty with respect to all of the conspiracy counts.  Moreover, the manner in which the government elicited Mr. Zaino's opinion testimony, including on the audio recordings, further enhanced his credibility. The government asked Mr. Zaino 183 times to testify based on his "experience."  See Welty Motion for Release Pending Appeal at 30 (Dkt. 405).  That is a telltale sign that the government was attempting to emphasize Mr. Zaino's expertise.  *United States* v. *(Carlos) Garcia*, 291 F.3d 127, 140 n.9 (2d Cir. 2002).

Relying on Mr. Zaino's testimony and his interpretation of the word "indication" on the audio recordings, the government emphasized in summation that Mr. Welty had the intent to harm because he engaged in a pattern of misconduct by lowering Mr. Grimm's "original bids" on the Count 4 transactions.  See, *e.g.*, Tr. 4285 ("you heard [Mr. Welty] lower Grimm's bid"); Tr.

16

4346 ("Welty allows Grimm to lower his bid, does it for him.").  The government prominently displayed to the jury during summation a demonstrative exhibit that compared "original bids" (*i.e.*, the indications that Mr. Zaino characterized as bids) and "final bids" (*i.e.*, the numbers that the government asserted had been lowered by Mr. Welty).  Given the relative weakness of the evidence against Mr. Welty on Counts 1 and 2 compared with Count 4, it is hardly surprising that the government focused disproportionately on Count 4 and the audio recordings, as interpreted by Mr. Zaino, in its summation as to Mr. Welty.

As the Goldberg Email reflects, Mr. Goldberg was prepared to concede the IHFA dispute (that is, concede that UBS had not submitted a bid to CDR) if UBS could produce "a tape using the words indication[.]"  Ziglar Decl., Ex. E.  It thus shows a categorical distinction by Mr. Goldberg, the government's own cooperating witness, between an "indication" and a "bid."  The Goldberg Email would have given the jury a powerful reason to doubt Mr. Zaino's opinion testimony concerning the Grimm-Welty audio recordings and Mr. Zaino's concomitant "aura of expertise and authority."  *United States* v. *Grinage*, 390 F.3d 746, 751 (2d Cir. 2004); *United States* v. *(Yuri) Garcia*, 413 F.3d 201, 215 (2d Cir. 2005).  And it would have given life to Mr. Zaino's testimony in the earlier *Carollo* trial – the substance of which the jury learned on cross-examination of Mr. Zaino by counsel for Mr. Welty – that an indication is not a bid.  Tr. 1654-57; Dkt. 405 at 33.  (The *Carollo* case, unbeknownst to the jury, included a count against Mr. Grimm that was a virtual mirror image of Count 4 in Mr. Welty's trial.)

The use of the Goldberg Email at trial also would have corroborated other evidence supporting Mr. Welty.  It would have corroborated Mr. Ziglar's testimony on behalf of Mr. Welty distinguishing "indications" from "bids."  And it would have corroborated the testimony

of several witnesses concerning the role of market volatility in that regard.  Dkt. 405 at 33 & n.11.

What is more, the Goldberg Email would have changed the complexion of the summations concerning Mr. Welty.  The government's pointed recapitulation of Mr. Zaino's opinion testimony in summation was the government's best argument that Mr. Welty had the requisite intent to harm.  The Goldberg Email would have undercut the government's summation – again, with the words of the government's own cooperating witness – that Mr. Welty engaged in a pattern of misconduct in lowering Mr. Grimm's "original bids" to the detriment of Mr. Welty's own clients.  Conversely, the Goldberg Email would have sharply supported the distinctions between "indications" and "bids" drawn by counsel for Mr. Welty in summation (including in response to the government's use of its "original bids"/"final bids" demonstrative exhibit) and the explanation of the transactions by counsel for Mr. Welty.

Finally, the Goldberg Email would have changed the jury's treatment of the Welty-Grimm audio recordings as a class of evidence.  In its opening statement, the government told the jury that it would hear Mr. Welty committing misconduct in his own words.  Tr. 383, 390.  The government emphasized that theme again in summation.  Tr. 4278, 4298.  If the jury had learned of *Mr. Goldberg's* own words that he would have treated a "tape" with the word "indication" as conclusive evidence to resolve a dispute against Mr. Goldberg's interests, it would have realized, based on evidence from the government's own cooperating witness, that the audio recordings at issue did not paint the picture of Mr. Welty's intent to harm described by Mr. Zaino and argued by the government.

In short, the words of another government cooperator in support of Mr. Welty's defense on a core issue in the government's case against Mr. Welty would have affected the jury in a way

18

that cross-examination of Mr. Zaino, testimony by Mr. Ziglar on behalf of Mr. Welty, and argument by counsel for Mr. Welty could not.  Especially given Mr. Zaino's central role in every conspiracy count, and the interconnectedness of the players and conduct in the conspiracies, the use of the Goldberg Email at trial would have substantially changed the jury's consideration of every charge against Mr. Welty.  Because the Goldberg Email is material within the meaning of *Brady* as to each of Mr. Welty's convictions, a new trial for Mr. Welty is the appropriate remedy for Counts 1, 2, and 4.

> D.    A New Trial Also Should Be Granted
>       For Mr. Welty In Light Of The Arguments
>       That He Will Make In His Pending Appeal.

The government's post-trial disclosure of the Goldberg Email also affects the analysis of the harmless error issues that will be addressed in Mr. Welty's pending appeal.  As discussed in the memoranda supporting Mr. Welty's motion for release pending appeal, Mr. Welty contends that Mr. Zaino's opinion testimony violated Fed. R. Evid. 701 (and 602) and that the jury instruction concerning "intentionally losing bids" was erroneous.  Dkt. 405 at 12-24, 25-30; Dkt. 418 at 9-14.  If the Court of Appeals determines that either one of those arguments is meritorious, the effect of any error must be analyzed under the harmless error standards discussed in Mr. Welty's motion for release pending appeal.  The nondisclosure of the Goldberg Email would substantially affect a harmless error analysis in Mr. Welty's favor as to each count of conviction.  Accordingly, we respectfully submit that the motion for a new trial should be granted for that reason even if the Court is not otherwise inclined to grant the motion.

II.    The Court Should Grant A New Trial For Mr. Welty On
       Counts 1, 2, And 4 Under Rule 33(b)(1) Regardless Of *Brady.*

Even if the Goldberg Email had not been suppressed within the meaning of *Brady*, a new trial on Counts 1, 2, and 4 for Mr. Welty is warranted.  A motion for a new trial under Rule

33(b)(1) based on newly discovered evidence that does not implicate *Brady* may be granted "only upon a showing that the evidence could not with due diligence have been discovered before or during trial, that the evidence is material, [that the evidence is] not cumulative, and that admission of the evidence would probably lead to an acquittal." *United States* v. *Alessi*, 638 F.2d 466, 479 (2d Cir. 1980); accord *United States v. Owen,* 500 F.3d 83, 88 (2d Cir. 2007); *United States* v. *Tutino*, 883 F.2d 1125, 1140 (2d Cir. 1989) (Wood, J.). "The 'ultimate test'" outside of the *Brady* context "is 'whether letting a guilty verdict stand would be a manifest injustice. . . . There must be a real concern that an innocent person may have been convicted.'" *United States* v. *Canova*, 412 F.3d 331, 349 (2d Cir. 2005) (quoting *United States* v. *Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001)).

Mr. Welty meets each of the ordinary standards governing new trial motions. He could not have discovered the Goldberg Email before or during trial with due diligence. The participants in the email communication worked at CDR and UBS. As the government acknowledges, the document does not exist in the UBS production. See Attachment 3. The government seized CDR's data in November 2006, Dkt. 455 at 1-2, and Mr. Welty's access to that data was controlled by the government. The evidence is not cumulative for the reasons discussed above with respect to *Brady*. And the evidence is material within the ordinary legal meaning of the word (as well as within the meaning of *Brady*).

The difference between the *Brady* standards and the ordinary standards governing a motion for a new trial, for practical purposes in this case, lies in the standard governing the judgment that the Court must make concerning the effect of undisclosed evidence on the verdict. Whereas *Brady* requires the Court to conclude before granting a new trial only that the evidence presents "a real enough possibility to undermine confidence in the verdict," *Mahaffy*, 693 F.3d at

134, the "neutral source" standard would require the Court to conclude that "admission of the evidence would probably lead to an acquittal." *Alessi*, 638 F.2d at 479; *Owen*, 500 F.3d at 88; *Tutino*, 883 F.2d at 1140 (Wood, J.).  For the reasons discussed above, Mr. Welty should receive a new trial under both standards.

III.    Mr. Welty Requests An Evidentiary
        Hearing And Oral Argument On This Motion.

        Although we respectfully submit that a new trial for Mr. Welty on Counts 1, 2, and 4 is warranted based on the undisclosed Goldberg Email alone, we respectfully request that the Court conduct an evidentiary hearing and permit oral argument on Mr. Welty's motion.  Whether a district court "should hold an evidentiary hearing before deciding a motion for a new trial rests in the discretion of that court." *United States* v. *Camacho*, 163 F. Supp. 2d 287, 313 (S.D.N.Y. 2001) (holding evidentiary hearing).  See *United States* v. *Petrillo*, 237 F.3d 119, 124 (2d Cir. 2000) (reviewing for abuse of discretion district court's denial of motion for a new trial without a hearing); *United States* v. *DiPaolo*, 835 F.2d 46, 51 (2d Cir. 1987) (holding that district court did not abuse its discretion in refusing to grant a hearing on a motion for a new trial and stating that where a motion is "predicated entirely on an affidavit from a trial witness who recants her testimony, a trial judge can ordinarily deny it without a hearing")."

        At an evidentiary hearing, we would seek to examine at least Messrs. Goldberg and Rothman.  At a minimum, counsel for Mr. Welty would seek to elicit testimony from Messrs. Goldberg and Rothman that the jury may have heard at trial if the Goldberg Email had been available to Mr. Welty.  Such testimony would allow the Court to assess in more detail the effect of nondisclosure on the jury's verdicts against Mr. Welty if the Court is not convinced that a new trial is warranted based on the Goldberg Email alone.

CONCLUSION

For the reasons stated above, and for any other reason that the Court may deem just and proper, defendant Michael Welty respectfully requests that the Court grant a new trial for Mr. Welty on Counts 1, 2, and 4 of the superseding indictment.  Mr. Welty respectfully requests an evidentiary hearing and oral argument on his motion.

Dated: January 6, 2014

Respectfully submitted,


/s Gregory L. Poe
Gregory L. Poe (admitted *pro hac vice*)
Preston Burton (admitted *pro hac vice*)
Rachel S. Li Wai Suen (RS-1145)
Poe & Burton PLLC
The Executive Building
1030 15th Street, N.W., Suite 580 West
Washington, D.C. 20005

*Attorneys for Michael Welty*

22

CERTIFICATE OF SERVICE

I hereby certify that on January 6, 2014, I caused true and correct copies of Defendant Michael Welty's Notice of Motion for a New Trial, along with an accompanying Memorandum of Law and Attachments, to be served via the Court's Electronic Case Filing system and electronic mail, on the following counsel:

Kalina M. Tulley
Jennifer M. Dixton
John L. Van Lonkhuyzen
U.S. Department of Justice, Antitrust Division
Midwest Field Office -- Rookery Building
209 South LaSalle Street, Suite 600
Chicago, Illinois 60604
*Attorneys for the United States of America*

Charles A. Stillman
James A. Mitchell
Ballard Spahr Stillman & Friedman LLP
425 Park Avenue
New York, NY 10022
*Attorneys for Peter Ghavami*

Marc L. Mukasey
Jonathan N. Halpern
Philip J. Bezanson
Bracewell & Giuliani
1251 Avenue of the Americas, 49th Floor
New York, NY 10020
*Attorneys for Gary Heinz*

/s Rachel S. Li Wai Suen
Rachel S. Li Wai Suen
Poe & Burton PLLC
The Executive Building
1030 15th Street, N.W., Suite 580 West
Washington, D.C. 20005
T: (202) 583-2500

*Attorney for Michael Welty*